UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

**RUHI REIMER AND NOOSHIN REIMER,**
on behalf of themselves and
all others similarly situated,

        **Plaintiffs,**

v.                                                Civil Action No. 3:20-cv-00360-REP

**BANK OF AMERICA, N.A.,**

        **Defendant.**

## PLAINTIFFS' OPPOSITION TO DEFENDANT BANK OF AMERICA, N.A.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Ruhi Reimer and Nooshin Reimer, on their own behalf and on behalf of others similarly situated, oppose Bank of America's Motion to Dismiss for the reasons explained in this memorandum of law showing that the Defendant is not entitled to the relief it seeks.

## OVERVIEW

Bank of America hopes that this Court will dissolve one of the central elements of the Equal Credit Opportunity Act ("ECOA" or the "Act") by finding it to be a meaningless requirement that a creditor provide a notice giving a statement of reasons for taking adverse action against an existing accountholder. Bank of America asks the Court to find the ECOA so meaningless that a majority of the consumers it is designed to protect have no standing to enforce its provisions, thereby giving creditors free reign to discriminate against its own customers. It is nonsensical for Defendant to ask that this Court undo rights that have been promulgated by Congress to protect consumers for decades. For the reasons set forth in this memorandum, Plaintiff respectfully

requests that Defendant's Motion to Dismiss Plaintiff's First Amended Complaint be denied.[1]

**I.  FACTS**

Plaintiffs, Ruhi Reimer and Nooshin Reimer initiated this action on May 19, 2020, against Defendant Bank of America, N.A. ("Defendant"), alleging a violation of the ECOA, 15 U.S.C. 1691. Plaintiffs filed their First Amended Complaint ("FAC") on July 10, 2020. (ECF 18.) In their Complaint, Plaintiffs allege that Defendant terminated their credit accounts and subsequently failed to send Plaintiffs ECOA compliant adverse action letters.

Plaintiffs had applied for and received credit from Bank of America, where they were accountholders in good standing for several years. (FAC ¶ 11-14.)  In or around June 2015, Plaintiffs received notices from Defendant informing them that their credit card accounts were being terminated based on the reason that the credit card agreement permits either party to terminate the agreement at any time. (FAC ¶ 15-18.)  After receiving Defendant's adverse action notices, Plaintiffs called Defendant, specifically to seek reconsideration of its decision to close the accounts. (FAC ¶ 19.)  The Plaintiffs' request that Bank of America reconsider its decision to terminate the Plaintiffs' accounts were unsuccessful and the accounts remained unilaterally closed by Bank of America. (FAC ¶ 19.)

Defendant's adverse action notice to each Plaintiff stated that the accounts were being terminated "in accordance with your Credit Card Agreement which permits either party to terminate the account at any time" and contained a paragraph entitled "EQUAL CREDIT

---

[1] Although not a basis for which Bank of America seeks dismissal because the case was brought within the statute of limitations, Bank of America nonetheless seeks to prejudice the court against the Reimers by making the outrageous accusation that Plaintiffs are manufacturing a claim "where none exists." (ECF 23, at 1).  The Reimers filed their action based on illegal adverse action notices sent to them by Bank of America within the limitations period.  Bank of America's statement is not only inflammatory and inappropriate, it is irrelevant to the basis argued in its motion to dismiss.

OPPORTUNITY ACT NOTICE." (ECF 8-1, 8-2, 8-3) However, the notices failed provide either Plaintiff with a statement of reasons for Defendant's decision to close their accounts, in violation of the ECOA. (FAC ¶ 42.) Consequently, Defendant's reasons for terminating the Plaintiffs' accounts remain a mystery to the Plaintiffs – they do not to this know whether it was as a result of discrimination or factors related to their creditworthiness. (FAC ¶ 38,42.)

**II.     LEGAL STANDARD**

"Where a motion pursuant to Rule 12(b)(6) contends that a plaintiff's pleadings are insufficient to show entitlement to relief, a court must resolve the motion by reference to the allegations in the complaint." *Andrews v. Paxson, Civil Action,* No. 3:11-CV-518, 2012 U.S. Dist. LEXIS 19919, at *3 (E.D. Va. Feb. 16, 2012) (See *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009)). "The question then before the court is whether the complaint contains 'a short and plain statement of the claim showing that the pleader is entitled to relief' in both 'law and fact.'" *Paxson*, 2012 U.S. Dist. LEXIS 19919, at *3-4. (quoting *Giacomelli*, 588 F.3d at 192-93). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, at 678 "When assessing a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all well-pled facts contained in the complaint as true." *Sanders v. Bank of Am.*, Civil Action No. 1: 16CV78, 2016 U.S. Dist. LEXIS 127092, at *3 (N.D.W. Va. Sep. 19, 2016) (citing *Nemer Chevrolet, Ltd v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009)). Finally, "[i]f the complaint alleges – directly or indirectly – each elements of a viable legal

theory, the plaintiff should be given the opportunity to prove that claim." *Paxson*, 2012 U.S. Dist. LEXIS 19919 at *4.

### III. PURPOSE OF THE ECOA ADVERSE ACTION NOTICE REQUIREMENTS

If the court were to determine that existing customers were not entitled to truthful adverse action notices, Bank of America and other creditors are free to terminate accounts without notice, let alone notice that provides a principal or truthful reason for termination. In fact, Bank of America and other creditors would be free of any fear for providing a false, thereby violating the ECOA's specific antidiscrimination and educational purposes. Why focus on the adverse action notice requirement rather than simply whether the Reimers were "applicants" for a limited purpose under the statute? Because the notice requirement is the central enforcement mechanism to ECOA's purposes of informing consumers, deterring discrimination, and enabling consumers to correct any problems that impede their access to credit, it is indispensable to protecting consumers whether they are in the initial process of applying for credit or having their accounts terminated after having had their applications approved.

The FAC alleges that Bank of America took action against the Reimers based on a reason other than merely Bank of America's reliance on provisions in the credit agreement that allowed either party to terminate the agreement. (FAC ¶ 24-25.) Rather than advise the Reimers of the true reason for termination, Bank of America concealed the reasons. This gives rise to the strong inference it was for a nefarious reason, but without the protections of the ECOA neither the Reimers nor any other consumer would ever have the right to know. This deprives consumers from meaningful access to the information, which they were entitled to receive under ECOA in order to investigate, correct and protect their creditworthiness. This is exactly the type of informational injury that Congress sought to redress through the ECOA adverse action notice

requirements.

No provision in the ECOA operates to extinguish consumers rights when they are both applicants and customers.  The Reimers did not lose the protections they enjoyed as credit applicants simply because they also became customers. Their right to be free from credit discrimination and to obtain information directly affecting their creditworthiness as applicants did not disintegrate when they signed a credit card agreement. They both suffered a congressionally-recognized injury when they were denied the accurate adverse action notice that the ECOA requirement was designed and enacted to afford and, as a result, deprived of the opportunity to investigate their true creditworthiness. The informational disclosure requirements at issue here were specifically enacted to protect consumers from the very harm that Bank of America's violation caused the Reimers.[2]

By enacting the adverse action notice requirement at issue here, Congress expressly identified its objective in preventing the very harm that the Reimers suffered.  In 1974, after extensive hearings in the House of Representatives, Congress passed the ECOA, "to ensure that the various financial institutions and other firms engaged in the extensions of credit exercise their responsibility to make credit available with fairness, impartiality, and without discrimination on the basis of sex or marital status." Pub. L. 93-495, § 502, 88 Stat. 1525 (1974) (Congressional Findings and Statement of Purpose); *see Fischl v. Gen'l Motors Acceptance Corp., 708 F.2d 143, 146-47 (5th Cir. 1983).*

Subsequently, in 1975, then-Senator Biden sponsored legislation to amend the ECOA to

---

[2] For the Reimers, it turns out that this denial of information also had real world consequence – the denial of information prevented them from re-establishing their credit accounts and, thus, lack of access to the credit they had enjoyed before the unilateral termination of the accounts. (FAC ¶¶ 39-40.)

5

create accountability for creditors' decisions by imposing notice obligations on creditors when they take "adverse action" against a credit applicant, including accountholders. *See* 15 U.S.C. § 1691(d)(2) (general notice requirements), (d)(6) (defining "adverse action" as, *inter alia*, "a denial or ***revocation*** of credit"). Senator Biden was concerned about how consumers were treated in the marketplace and believed that consumers had an absolute right to fair credit treatment. Amendments to the Equal Credit Opportunity Act: Hearings before the subcommittee on Consumer Affairs U. S. Senate, at 1 (1975). He emphasized that nothing frustrates consumers more than being denied credit without an explanation why, and the intent of the legislation was to require creditors to provide those reasons because "a *consumer* has a *right* to know." *Id*. at 2 (emphasis added.) Biden emphasized that the adverse action notice requirement was intended to provide consumers with a substantive reason in order to ascertain whether adverse credit decisions were for legitimate reasons or invidious discrimination. *Id*. at 10-11. Biden made clear that the amendments to the ECOA specifically were carefully designed to ensure that consumers had access to ECOA information when credit was denied or terminated. *Id.*

Testimony in support of the ECOA amendments reinforced the facts that the amended ECOA was designed to address. For example, Congresswoman Leonor K. Sullivan[3] explained, "[c]onsumers who are rejected for credit are entitled to know the reason why. If their creditworthiness is questionable, they can do something about correcting it." *Id*. at 26.

These reasons were underscored by further testimony Congress heard before enacting the ECOA amendments. John B. Martin of the National Retired Teachers Association and the American Association of Retired Persons testified that many of his members had expressed the

---

[3] Sullivan was the former chairperson of the House Subcommittee on Consumer Affairs who, "fought long and hard" for passage of the ECOA.

fear that some adverse information from a source other than a credit reporting agency somehow had affected their credit decision or that a mistake had been made, yet they had no way of knowing for certain. *Id*. at 75.

Sheldon Feldman, Assistant Director for Special Statutes at the Federal Trade Commission, testified that requiring a statement of the reasons for the credit denial would facilitate both private and administrative enforcement of the Act because without the creditor's statement of the reason, an applicant or enforcement agency would have no basis to judge whether the adverse action was legitimate. *Id*. at 219. Mr. Feldman further testified that supplying a rejected applicant with a statement of the reason would also enable an applicant to improve his or her credit record." *Id*.

The Senate Report similarly stated,

> The requirement that creditors give reasons for adverse action is, in the Committee's view, a strong and necessary adjunct to the antidiscrimination purpose of the legislation, for only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices.
> * * *
> [W]e believe that knowing the reasons for adverse action will, over time, *have a very beneficial educational effect on the credit-consuming public* and a beneficial competitive effect on the credit marketplace.

S. REP. No. 94-589, at 406, 408, 1976 WL 13838, at *4, 7 (Jan. 21, 1976) (emphasis added).

Upon signing of the amendment expanding the ECOA into law, President Gerald Ford issued a statement on March 23, 1976, in which he confirmed that in addition to its antidiscrimination purpose, the law

> permits the Attorney General, as well as private citizens, to initiate suits where discrimination in credit *transactions* has occurred. It also provides that a person to whom credit is denied is entitled to know of the reasons for the denial.

Presidential Statement on Signing the Equal Credit Opportunity Act Amendments of 1976, *available at* http://www.presidency.ucsb.edu/ws/?pid=5745 (last visited Aug. 7, 2020). These "twin goals" of the 1976 amendment to the Act have been repeatedly recognized by the courts as

the basis for the statutory requirement. *See Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 146 (5th Cir. 1983) ("Perhaps the most significant of the 1976 amendments to the ECOA, these provisions were designed to fulfill the twin goals of consumer protection and education.").

In furtherance of these "twin goals," the implementation of the ECOA is carried out through regulations promulgated by the Consumer Financial Protection Bureau (CFPB). 15 U.S.C. § 1691b. The relevant provisions pertaining to the definition of applicant and the requirements for adverse action notices are known as "Regulation B." 12 C.F.R. §§ 1002.2, 1002.9.

In the decades that have passed since the ECOA and implementing regulations have been in force, Bank of America now turns to the court to ask it to undo consumer protections that have been successfully in place to carry out the anti-discrimination and educational purpose of the ECOA. Even Bank of America has interpreted and applied the ECOA to require it to send an adverse action notice to its existing customers when it terminates credit accounts as manifested by the fact that it actually sent adverse action notices – albeit illegal ones – to the Reimers in this case.[4]

## IV. ARGUMENT

### A. Plaintiffs Are "Applicants" Under The ECOA

#### 1. The ECOA's Plain Language Definition Of "Applicant" Includes Those Who Have Previously Received An Extension Of Credit

"When interpreting a statute, the first step is to 'determine whether the language at issue

---

[4] *See e.g. Treadway v. Gateway Chevrolet Oldsmobile, Inc.,* 362 F.3d 971, 981 (7th Cir.2004)(concluding that the defendant's treatment of the application as complete required it to comply with the ECOA, "[E]ven if it was not an application in the beginning, when [creditor] declined [applicant's] request, it became an application and creditor was required to comply with [ECOA's notice provisions]."). In this case, because Bank of America sent the adverse action notices, complete with ECOA citations and warning, when it terminated the Reimers' accounts, it treated the Reimers as applicants against whom it had taken adverse action within the meaning of the ECOA. Thus, its adverse action notices had to comply with the ECOA. *Id.*

8

has a plain and unambiguous meaning with regard to the particular dispute in the case. The inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent'" *United States v. Nelson*, 417 F. Supp. 2d 773, 775 (E.D. Va. 2006) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997). "Whether the statute is plain or ambiguous 'is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole'" *Id.* (quoting *Robinson,* 519 U.S. at 341). Bank of America's argument that the Reimers are not entitled to the protections of the ECOA because they were accountholders "runs afoul of the principle that statutes must be construed as a whole and in such a way as to give each part its plain meaning effect." *Layell v. Home Loan & Inv. Bank, F.S.B.,* 244 B.R. 345, 350 (E.D. Va. 1999).

The ECOA entitles an "applicant," against whom "adverse action" is taken, to a letter providing a statement of reasons for such action. 15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.9. The Act defines "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit . . ." 15 U.S.C. § 1691a(b). Furthermore, the Act defines "adverse action" as "a denial or **revocation of credit**, a change in terms of an **existing credit arrangement**, or a refusal to grant credit in substantially the amount or on substantially the terms requested," and further adds "[s]uch term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously establish credit limit." § 1691(d)(6). Considering the language itself, the specific context in which the language is used and the broad context of the ECOA, it is evident that Plaintiffs fit within the meaning of "applicant" and thus are protected parties.

The inclusion of the "revocation of credit" and "existing credit arrangement" makes it clear

9

that Congress intended "applicant" to include existing accountholders. Importantly, the provision of the ECOA requiring an adverse action statement was an essential component of the Act. *See* S. Rep. No. 94-589 at 7 ("The Committee believes that the provision entitling rejected applicants to a statement of reasons for adverse action is among the most significant parts of the bill. . . [and] is essential to achieve the anti-discrimination goals of the legislation."). A "revocation of credit" or "a change in the terms of an existing credit arrangement" can occur only after a consumer has previously received an extension of credit. Thus, it is nonsensical to suppose Congress tailored the adverse action requirement without existing accountholders in mind. Any contrary interpretation would effectively nullify the ECOA's protections for a "revocation of credit" and "changes to the terms of existing credit arrangements."

"[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *United States v. Woody*, 220 F. Supp. 3d 682, 689 (E.D. Va. 2016) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Interpreting the ECOA's definition of "applicant" to exclude existing accountholders will do just that; it will undermine the provision Congress considers one of the most significant parts of the Act by allowing creditors to evade liability for discrimination against existing accounts. *See Powell v. Pentagon Fed. Credit Union*, 2010 U.S. Dist. LEXIS 97473, *12 (N.D. Ill. September 17, 2010) ("To exclude discriminatory revocations of existing credit accounts from the list of actionable adverse actions would undermine in part the purpose of the statute.") To avoid detection of discrimination, a creditor could merely extend credit to a consumer and subsequently terminate it without providing any reason.  Not only would this subvert the twin purposes of the adverse action notice provision as a necessary tool for enforcement of the anti-discrimination and educational purposes, it would further damage consumers by restricting access to credit.

Defendant relies on several distinguishable cases to support its contention that Plaintiffs are not "applicants." Defendant first cites *Kalisz*, where a Plaintiff's ECOA complaint was dismissed because the Plaintiff did not establish that "she sought to apply for a new loan, or an extension or renewal of existing loan during the time when she was allegedly discriminated against." *Kalisz v. Bank of Am., N.A.*, 2018 U.S. Dist. LEXIS 155587, *6 (E.D. Va. September 11, 2018). Similarly, the dismissal in *TeWinkle* was based upon the fact that Plaintiff did not allege his credit request was "a new request, an extension of existing or additional credit or a resist[ance] [of a] termination of credit." *TeWinkle v. Capital One*, 2019 U.S. Dist. LEXIS 215238, *12 (W.D.N.Y. December 11, 2019). In contrast, Plaintiffs' First Amended Complaint alleges the Plaintiffs called Defendant to seek reconsideration of its decision to close their accounts. (FAC ¶19.) "Upon receiving the notice [of termination] . . . plaintiff would have been an applicant if he sought reconsideration . . ." *TeWinkle*, 2019 U.S. Dist. LEXIS 215238, *12. Defendant further relies on *Stefanowicz*, which again is evidently distinguishable from the Plaintiffs' claims in the instant action. In *Stefanowicz*, the court dismissed the Plaintiff's ECOA claim because "[i]t is [ ] clear from the facts alleged that Stefanowicz was in default at the time of the alleged discrimination, under which circumstances the defendants' failure to allow her to modify her loan does not constitute a prohibited "adverse action" under the ECOA." *Stefanowicz v. SunTrust Mortg.*, 2017 U.S. Dist. LEXIS 3592, *19 (M.D. Pa. January 9, 2017). Contrary to *Stefanowicz*, Plaintiffs' First Amended Complaint states the Plaintiffs' accounts were in good standing at the time of Defendant's decision to terminate the accounts. Doc. 18 ¶36. Such allegations must be accepted as true. *See E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448 (4th Cir. Va. March 11, 2011) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (U.S. June 4, 2007)) ("When ruling on a Rule 12(b)(6) motion to dismiss, 'a judge must accept as true all of the factual allegations

contained in the complaint.'")

Every other case Defendant relies upon in support of its contention that Plaintiffs are not "applicants" fails for similar reasons. *See Clark v. Capital One Bank*, 2008 U.S. Dist. LEXIS 11991, *5 (D. Idaho February 19, 2008) (dismissing the ECOA claim where plaintiff made no allegation that she directly applied for an extension, renewal, or continuation of credit); *Alexander v. AmeriPro Funding*, Inc., 848 F.3d 698, 707 (5th Cir. Tex. February 16, 2017) (dismissing the ECOA claim where plaintiffs only allege that they contacted defendant and made an inquiry into financing a home, but did not formally apply for a loan). Defendant has not relied on a single case with factual similarities to the instant action, where Plaintiffs allege their accounts were terminated while in good standing, Defendant failed to provide a statement of with the principal reason for the terminations, and Plaintiffs sought reconsideration.

Defendant next contends that Plaintiffs' unsuccessful attempt to seek reconsideration from Defendant does not bring Plaintiffs within the ECOA's plain language definition of "applicant." Notably, Defendant provides no law to support its conclusion. *See TeWinkle*, 2019 U.S. Dist. LEXIS 215238, *12 ("Upon receiving the notice [of termination] . . . plaintiff would have been an applicant if he sought reconsideration . . .").

Upon receiving Defendant's termination notices, Plaintiffs sought reconsideration from Defendant, thereby bringing them within the ECOA's plain language definition of "applicant." Defendant's Motion essentially asks that this court to dissolve one of the central elements of the ECOA by making the "adverse action" notice requirement meaningless. While Defendant cites several past ECOA dismissals, each and every case it has relied upon is clearly distinguishable from the facts alleged in the instant action.

    **2. If The ECOA's Definition Of "Applicant" Is Ambiguous, Plaintiffs Are "Applicants" under Regulation B**

12

If the Court finds the ECOA's definition of "applicant" ambiguous, it should defer to the regulatory definition. *See Nat'l Elec. Mfrs. Ass'n v. United States DOE*, 654 F.3d 496, 504 (4th Cir. August 16, 2011) (quoting *Chevron, U.S.A., Inc. v. NRDC*, Inc., 467 U.S. 837, 843 (U.S. June 25, 1984) (if a "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). "Under *Chevron's* two-step analysis, the Court first asks whether "Congress has directly spoken to the precise question at issue . . .[and] [i]f the Court fails in its initial endeavor and cannot ascertain unambiguous Congressional intent, it proceeds to the second step of the *Chevron* analysis. . . . whether the [administrative agency's] interpretation is 'based on a permissible construction of the statute.'" *Jaghoori v. Lucero*, 2012 U.S. Dist. LEXIS 23273, *7 (E.D. Va. February 22, 2012) (quoting *Chevron, U.S.A., Inc.*, 467 U.S. at 842-43). There is not a single indication in the plain language of the ECOA that a consumer is no longer entitled to the protections he or she enjoyed as an applicant when they become account holders subject to adverse action by creditors. To extinguish a consumer's rights to the anti-discrimination and educational protections of the statute would lead to an absurd result disfavored in law and public policy. *Treadway,* 362 F.3d at 981.

The narrow interpretation of "applicant" that Defendant champions would undermine the well-established purpose of the ECOA, to protect both potential and existing accountholders from discriminatory conduct. *See Powell*, 2010 U.S. Dist. LEXIS 97473, *12 ("[a]pplying the term "applicant" as narrowly as Defendant suggests would preclude a plaintiff with an existing account from bringing a claim for the discriminatory revocation of that account."). Considering the specific issue here, whether Plaintiffs are "applicants" under the ECOA, the Court must first consider whether Congress has directly spoken on the precise question. While Congress has noted the importance of the "adverse action" section of the ECOA, it has not spoken directly on whether

existing accountholders are "applicants" under the Act. Next, the Court must consider Regulation B's definition of "applicant;" "any person . . . who has **received** an extension of credit. . . include[ing] any person who . . . is contractually liable regarding an extension of credit." 12 C.F.R. § 1002.2(e). Regulation B further requires a creditor to notify an applicant of action taken within "30 days after taking adverse action on an **existing account**." 12 C.F.R. § 1002.9(a)(iii) (emphasis added). "The ECOA delegated to the Federal Reserve Board the power to implement regulations in furtherance of carrying out the Act's purpose[,]" and for this reason, its regulations are entitled to substantial deference. *Powell*, 2010 U.S. Dist. LEXIS 97473, *12-13 (citing *Treadway,* 362 F.3d at 975). Prior to the CFPB rulemaking, that authority rested with the Federal Reserve Board. However, the broad definition of "applicant" has remained constant. *See* 12 C.F.R. § 1002.2; 12 C.F.R 202. Deferring to CFPB's definition, Plaintiffs are clearly "applicants," as they received an extension of credit and were contractually liable regarding such.

Defendant argues against the Court applying the Regulation B definition of "applicant," and once again directs the Court's attention distinguishable caselaw. Defendant first cites *Regions Bank* and *Hawkins*, where the courts were charged with deciding if the ECOA was ambiguous as to whether a guarantor is considered an "applicant." The courts indeed found "it to be unambiguous that assuming a secondary, contingent liability does not amount to a request for credit." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1191 (11th Cir. Fla. August 28, 2019) (quoting *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 942 (8th Cir. Mo. August 5, 2014)). Crucially, the *Regions Bank* and *Hawkins* analyses were specific to third-party guarantors and did not go on to address the ECOA's definition of "applicant" as it relates to the actual applicants who were accountholders subject to adverse actions.

Defendant further relies upon *Kalisz*, where this Court dismissed a Plaintiff's ECOA claim

because she "failed to cite any case law or establish any reason why regulatory definition of 'applicant' should control." *Kalisz*, 2018 U.S. Dist. LEXIS 155587, *7. Importantly, the Plaintiff's opposition briefing in *Kalisz* made no attempt to effectively argue its stance concerning the ambiguity of the ECOA's plain language definition of "applicant." Rather, in that case, the Plaintiff merely recited Regulation B's definition of "applicant" without further analysis. The Plaintiff's failure to provide this Court the opportunity to conduct a *Chevron* analysis in *Kalisz* should bear no weight on the Court's decision in this case.

## V.   CONCLUSION

"Banks have long been eager to knock down regulations one peg at a time.." by diminishing the Chevron deference. https://www.americanbanker.com/news/would-weakening-regulators-edge-in-court-backfire-on-banks (last visited 8/10/2020.)  In this case, the "peg" that Bank of America seeks to knock down is a critical consumer protection to prevent discrimination and provide crucial credit information to consumer which are central components of the ECOA by depriving consumers of adverse action notices if they are terminated as existing account holders. Bank of America's arguments are not only legally wrong, they are contrary to the remedial purpose of the ECOA and must be denied.  For these reasons, the Court should deny the Defendant's motion to dismiss.

Respectfully,

**Ruhi Reimer and Nooshin Reimer, on behalf of themselves and all similarly situated individuals,**

By: _____/s/_____
Susan M. Rotkis, VSB #40693
Price Law Group, APC
382 S. Convent Ave.
Tucson, AZ 85701
Tel: (818) 600-5506

Fax: (818) 600-5405
E-mail: susan@pricelawgroup.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter.

Brian E. Pumphrey (VSB No. 47312)
Heidi E. Siegmund (VSB No. 89569)
Keith J. Minson (VSB No. 89417)
MCGUIREWOODS LLP
Gateway Plaza
800 E Canal Street
Richmond, VA 23219
Telephone: (804) 775-1000
Fax: (804) 698-2315
bpumphrey@mcguirewoods.com
hsiegmund@mcguirewoods.com
kminson@mcguirewoods.com

Tanya L. Greene (CA State Bar No. 267975)
*(Pro Hac Vice*)
Wells Fargo Center, South Tower
355 S. Grand Avenue
Suite 4200
Los Angeles, California 90071
Telephone: (213) 457-9879
Fax: (213) 457-9899
tgreene@mcguirewoods.com

*Counsel for Defendant*
*Bank of America, N.A.*

By: _____/s/_____
Susan Mary Rotkis, VSB 40693
Price Law Group, APC
382 S. Convent Ave.
Tucson, AZ 85701
T: (818) 600-5506
F: (818) 600-5433
E: susan@pricelawgroup.com
*Attorneys for Plaintiffs*